## ALCORN v BARRETT

Ohio Common Pleas, Montgomery Co

Decided Feb 22, 1936

E. W. Schulman, Dayton, George Alcorn, Dayton, and W. S. Rhotehamel, Dayton, for plaintiff.

N'cholas F. Nolan, Prosecuting Attorney, Dayton, for defendant.

## OPINION

By DOUGLASS, J.

The plaintiff in this cause seeks judgment against the defendant, as deputy registrar of motor vehicles, for Montgomery County, for the sum of ten cents, allegedly illegally collected from the defendant, and seeks, further, the appointment of a master commissioner to require an account'ng of all like fees allegedly illegally collected, and prays for all other relief to which he and others similarly situated may be entitled, in law or in equity.

It is the contention of the plaintiff that he was compelled to pay the sum of ten cents, in addition to the statutory fee of fifteen cents allowed to the deputy registrar for clerical help, that he tendered the sum of fifteen cents, and also the sum of seven dollars as the licensee fee proper for his automobile, but that the deputy registrar refused to issue the license until the plaintiff paid an additional sum of ten cents. He contends that this additional sum is illegal; that the deputy registrar is without authority at law to collect any fees additional to those specifically provided in the statute therefor provided.

The defendant admits the allegation of the plaintiff's petition to the effect that he charged the sum of seven dollars, and also admits the charge of twenty-five cents extra; he contends that as deputy registrar he is authorized by law to charge the additional sum of twenty-five cents.

The defendant was appointed deputy registrar of motor vehicles for Montgomery County by the state registrar of motor vehicles; and in performance of his duties as deputy registrar, established offices from which approximately 36,000 licenses were issued to motor vehicle owners in Montgomery County during the year 1935.

The evidence shows that the deputy registrar receives no salary; that the discharge of his duties requires the employment of assistants; that he is required to pay office rentals and bear all incidental expenses of issuing licenses. The evidence indicates that the sole compensation of the deputy registrar comes from the moneys collected from the ten cent and fifteen cent fees charged, which fees are additional to the license charge proper; that the ten cent fee, additional to the statutory fifteen cent fee charge is made in a conclusive proportion of the licenses issued. The evidence indicates that the administration of the office of the deputy registrar is under the general supervision of the state registrar of motor vehicles, and that the office of the state registrar authorized the defendant to charge the additional ten cents; that practically the same system obtains throughout the state.

The evidence indicates further that this extra charge system has obtained for several years; that no public accounting is required, either as to the fifteen cent fee, or the additional ten cent fee; that a daily accounting is made for all moneys taken in for the license proper. The money from the two fees, supra, thus collected, is not treated as public money; no record being made, no accounting required, and no recognition given such funds as public money.

The deputy registrar is under official bond, and no question is raised as to any recognized public moneys collected by him and required to be accounted for officially, such money being deposited daily to the

credit of the state, and the state being protected by the bond.

The main question involves the legality or illegality of the charge of ten cents, which appears to be charged in all cases where the deputy registrar, in addition to assisting in preparing and receiving the papers of the applicant, notarizes them and issues license on the application.

Approximately 36,000 licenses were issued by the defendant. The plaintiff offered evidence to show that all others similarly situated were interested parties, and tendered into the record the names of numerous local citizens who had allegedly paid the same or larger fees for similar purposes. The inquiry also embraces the question as to whether the plaintiff is properly in court in that he claims judgment for only ten cents, but claims representation of a class, consisting of thousands of motor vehicle owners similarly situated.

Scant discussion of the evidence is required. A slight dispute obtains as to the amount charged for this extra service, and several witnesses testified that they had paid more than ten cents. It will suffice, for the purposes of this decision, to consider that the fee collected is ten cents, in addition to the fifteen cents plainly allowed by law; this charge appears to have been made in practically all the licenses issued.

In order to determine the question presented, it is necessary to consider the origin and nature of the office occupied by the defendant, the duties of that office in the administration of the motor vehicle law, the source of and limitations upon the authority of the deputy registrar, the application of the particular statutory law involved, and the process of redress sought by the plaintiff.

The evidence indicates that the state registrar of motor vehicles has recognized, adopted and approved the system, in operation. The case, therefore, while immediately involving residents of Montgomery County, also involves a system generally obtaining throughout the state, and is, therefore, of broad public interest and importance.

The question reduced to its plainest terms is whether or not the deputy registrar is authorized to charge any fee additional to that prescribed by statute.

The registrar and deputy registrar are both statutory officers, and the authority exercised by them is wholly statutory, plainly defined and specifically limited.

Sec 6290-1, GC, provides for a bureau of motor vehicles, directed by a registrar, who is appointed by the director of highways. This section, in part, provides that:

"It shall be the duty of the registrar to administer the laws of the state relative to the registration of motor vehicles. The registrar may, with the approval of the director of highways, appoint such number of assistants, deputies, clerks, stenographers, and other employees as he may deem necessary to carry out the provisions of this act. The salary of each of such employees shall be fixed by the director of highways within the limits of the appropriations made by the General Assembly.

"The salaries and the actual and necessary expenses incurred by the registrar or any of his subordinates when approved by the director of highways, shall be paid from the state treasury on the warrant of the auditor of state.

"The registrar shall give a bond for the faithful performance of his duties in such amount and with such security as the director of highways may approve. When in the opinion of the director of highways, it is deemed advisable, any deputy or other employee may be required to give bond in such amount and with such security as he may approve."

An analysis of this section indicates that it is the purpose of the law to require officials concerned with enforcement of the law to be paid salaries, and the evidence discloses that all subordinates of the registrar, except local deputy registrars and their employees, are paid salaries out of state treasury funds upon vouchers therefor. It further indicates that actual and necessary expenses of the registrar and his subordinates are paid from the same source.

However, §6291-1 GC is as follows:

"The registrar shall designate the county auditor and one or more persons in each county to act as deputy registrars, who shall accept applications for the annual license tax, and assign distinctive numbers in the same manner as the registrar. Such deputy registrars shall be located in such cities or villages in the county as the registrar sees fit. For the purpose of facilitating the distribution of license tags, the registrar may provide for the establishment of branch offices in cities having a population of 100,000 or over according to the last federal census.

"The registrar shall assign to each deputy registrar a series of numbers sufficient to supply the demand at all times in such community, and shall keep a record in his

office of the numbers within the series so assigned. Each deputy registrar shall be required to give bond, the form and amount of which shall be prescribed by the regi - trar.

"The deputy registrars shall keep a fi'e of each application and register such motor vehicle with the name and address of the owner thereof."

Obviously this section contemplated appointment of the county auditor as a deputy registrar, but it contains no provision as to salaries of deputy registrars. The auditor could not draw such salary, but appointment of a deputy registrar other than the auditor would naturally require compensation. Consequently, it must be presumed that some compensation for deputy registrars is contemplated. As to clerical help, §6294 GC provides:

"Each deputy registrar shall be allowed a fee of not to exceed fifteen cents, which shall be in addition to the license tax and shall be for the purpose of paying for the additional help required in the receiving of applications and the issuing of licenses. In the case of the county auditor, such fifteen-cent fee shall be paid into the auditor's fee fund. Each application for registration shall be signed and verified by the owner before a person authorized by law to administer oaths and each deputy registrar shall be authorized to administer oaths 'n the matter of applications for registrali n and no fee shall be charged for such service." (§6294 GC).

The deputy registrar employed a large clerical force in rush periods, due to the rush and necessity of issuing a large number of licenses in a short period. Thirty-two assistants, eight of them being notaries, were employed. The notaries' work was largely confined to notarization of the applications.

The deputy registrar testified that it was impossible to run the office, furnishing the assistants required for the work, on the sum of fifteen cents provided by §6294 GC for each license issued. He did not request allowance of public money for these purposes, but on the contrary, was advised that he might collect the extra ten cent fee from each applicant.

It appears that the entire legal responsibility being upon the state registrar, and the defendant herein having acted under the instructions and with the approval of his superior. no blame should attach to him or his administration.

The nature of the services for which the extra fees were charged appear to have been for comp'eting and notarizing the applications. It is contended that the statute did not contemplate that the applicant should have free notarization or that the deputy reg'strar should fill out the applications. The statute provided that the deputy registrar should be authorized to notarize applications, but specifically prohibited him from charging for such service.

At the time of making application, the applicant is required to present for inspection proper bills of sale, or a sworn statement of ownership. If the application is not in proper form, or if a proper bill of sale or sworn statement of ownership is not furnished, and "if all registration and transfer fees required by law have not been paid," the license may be refused.

The record does not disclose any service rendered this applicant not contemplated by the statute, or reasonably inherent in the usual course of administering such public duties, and the court is of the opinion that no basis in law or facts exists for making the extra charge herein indicated.

As a defense, it is contended that the payment of the extra ten cent charge was voluntarily made. In substantiation of this contention, the defendant testified that large placards were prominently displayed in the office, easily seen and read, containing the following words:

NOTICE

FEES ..................... Charged When Application is Fully 
 Completed and Notarized .........15c 
Otherwise ........................... 25c 
 A. M. Barrett, Dep. Registrar.

The defendant contends that the public was thus notified; that if the papers were brought there completely filled out, fifteen cents was charged; if, on the other hand, they were not completely filled out, twenty-five cents was charged.

It is urged that the public was not compelled to have the deputy registrar and his assistants fill out and notarize the applications. A consideration of the facts fully answers this contention. It is utterly impractical for the average motor vehicle owner to enter the office of the deputy registrar prepared with all necessary papers filled out, notarized and ready for acceptance. Even if applicants prepared the applications, close checking by the official clerical assistants would be required, and even then the records would probab'y be in a very unsatisfactory condition. Fur-

ther, the practice of the past indicates that the public received this service free of charge.

The average owner would have reason to rely upon proper charges being made, and would not anticipate the necessity of ascertaining his legal rights in such matters. Public office carries public trust, and the public is not required to be on guard against illegal administration of the office.

There is no doubt as to the fact that an applicant for a license felt that he was compelled to pay the extra fees since such charges were actually solicited from him, and he was advised that he would have to pay them before he could secure his license. The fact that probably some applicants may have been personally willing to pay the extra ten cents is immaterial in this case. Payment of this extra fee was not voluntary in the legal significance of that word. The motorist had to make the payment or stop using his automobile.

When the average citizen enters a public office to secure a license, he is compelled by the very nature of the circumstances confronting him to pay the fee demanded. He has no way to calculate exactly the amount which is required, and is utterly without protection against a demand from the official issuing the license. The official, on the other hand, has an absolute control over the situation, and may readily refuse a license if the applicant does not accede to his request in reference to fees. Therefore, it is particularly important that no law of this nature should be extended by administrative fiat, and it is basicly contrary to sound public policy to permit officials to enlarge their compensation by accepting any compensation not specifically provided by law.

The state registrar of motor vehicles cannot by instruction, written or verbal, by condonation, based upon custom or adoption, change one whit the specific provisions of this law, and set up in the motor vehicle department a source of revenue not contemplated by the law. Such a principle carries with it inherently vicious possibilities.

This fee is a species of taxation. The legislature alone can impose tax. No bureau, no executive, nor administrative office can decide on, impose and collect a tax unauthorized by law, solely because it appears to be needed.

This case transcends the trivial money involved, and reaches to the very essence of public trust in, and security by, public office. It involves a problem embracing the entire motor vehicle administration in the state, but it also involves the paramount principle that the power to exact an illegal fee is a power which invades private rights, which are then instantly entitled to the broad protective power of the judiciary.

The evidence indicates that prior to 1928 there was no uniform charge in respect to this aspect of the administration, and that in some localities charges as high as thirty-five, forty-five and fifty cents were being made, and that the Motor Vehicle Bureau corrected this practice by ordering that not more than twenty-five cents be charged. The bureau should have stopped all illegal charges rather than attempt to curb the amount and define the size of the illegal fee.

It is difficult to comprehend that this system could have developed in this state by practice or official authorization without adequate instruction as to its legality. By this illegal practice there has been engrafted on to the statute privileges and obligations utterly outside the provisions of the law, contrary to and unwarranted by it, and inimical to its proper administration.

The evidence indicates that there are 1,700,000 motor vehicle registrations in the state of Ohio; that total revenue from license fees amounted to $21,000,000 in 1935. A trivial portion of this stupendous fund would sustain administration of the law without these extra charges to the motorist.

A careful study of the law reveals that this erroneous administration results from failing to comply with the provisions of the statute in reference to salaries and expenses of the deputy registrars. As the court has indicated hereinbefore, these deputy registrars were appointed by virtue of the authority conferred upon the registrar in §6290-1 GC. As indicated, the defendant is a deputy registrar, and §6290-1, GC, provides specifically that the salaries of deputy registrars shall be fixed by the director of highways within the limits of the appropriations made by the General Assembly. It appears very plain then that no deputy registrar should be permitted to secure his salary or his compensation, either from the fifteen cent allowance for clerical assistants, or from any extra charge of any nature. This provision of §6290-1 GC is amplified and restated in the second paragraph of §6290-1 GC, which specifically provides that both the salaries and the actual and necessary expenses incurred by the registrar, or any of his subordinates, should

be paid from the state treasury. This provision of the law not being observed, and the deputy registrars being left to the task of creating a sufficient income to administer the law, and being permitted by the state registrar to exact this illegal fee, it is natural that confusion and illegality in the administration should ensue.

The court does not comprehend by what authority under the law the registrar has appointed deputies without specific compensation provided. As indicated hereinbefore §6294 GC, providing the fifteen cent extra charge, specifically states that it is for additional clerical help for the deputy registrar, and by this specific statement excludes any conclusion that it is compensation to him as a deputy.

The court is of the opinion, furthermore, that it was the general purpose of the legislature that the county auditor should generally be the chief local deputy registrar, and that only when necessary should additional deputy registrars be appointed. In the urban counties extensive deputy registrar systems may be advisable, and the legislature evidently recognized this situation.

Sec 6291-1 GC may have been interpreted heretofore as directory, but any application of the law as directory rather than mandatory will bring about the results as obtained in this case. The court is of the opinion that §6291-1 GC is not directory, but rather that it is mandatory, and when interpreted as mandatory upon the registrar, this section enables the law to be administered as contemplated by the legislature.

If the registrar appoints the county auditor as a registrar, he still has the privilege of appointing other deputies, if necessary. He may appoint deputy registrars in the different villages of the county to facilitate the administration of the license law. On the other hand, the court does not conclude that the second sentence in §6291-1 GC permitting the location of the deputy registrars in villages and cities precludes the appointment of the auditor. A strict adherence to the intention of the legislature in this regard would avoid, to a large extent, the present confusion existing in reference to these fees. As the matter now stands, the state registrar has created private offices out of the position of deputy registrars, in that he has given these deputies the authority to collect money for services, although no authority at law obtains for such collections. He has combined, therefore, private enterprise with public office, and has endowed the deputy registrars with authority of law in reference to the vital question of motor vehicle license, and at the same time permitted them to ignore the law and secure compensation on a private basis.

The court is of the opinion that any such system as this is contrary to the specific law established, contrary to the purposes and provisions of the Constitution in reference to public offices, and contrary to public policy. It is particularly objectionable when the power exercised by the appointee can reach to such a vital proposition as motor vehicle operation, and the appointee can withhold the right to a citizen to operate his motor vehicle unless that citizen pays the fee decided upon by the registrar or his deputy, without authority at law.

The motor vehicle law was not intended to set up a private business. The practice now obtaining transforms a governmental operation into an office hybrid of government authority and private enterprise. The office revenue is partly under the law and partly outside the law. The vesture of government authority carries with it only government purposes, subject to legal limitations, and every departure from this fundamental principle is an invitation to usurpation and abuse.

It appears to the court that the deputy registrars' salaries should be paid specifically out of a specific fund for that purpose under the provisions of §6290-1 GC as to salaries and expenses. There is nothing in the context or exact provisions of that section to indicate that such expenses are confined to office personnel in the Columbus office, and in fact, all the inspectors and traveling agents of the registrar are paid salaries, leaving only deputy registrars to create, maintain and operate offices out of fees realized by the indicated statutory extra charge, and the illegal extra charge.

The provisions of §6294 GC apply solely to the allowance to the deputy registrar for clerical help, his compensation not being determined by its provisions.

"Each deputy registrar shall be allowed a fee of not to exceed fifteen cents, which shall be in addition to the license tax and shall be for the purpose of paying for the additional help required in the receiving of applications and the issuing of licenses."

The purpose of the fee being expressed, this section excludes purposes not express-

ed. Nor does this section provide that the fifteen cents is to pay for office rent and overhead. It is not to pay salary of an annual or occasional nature to a deputy supervisor. In event the auditor acts as deputy registrar, the fifteen cent fee is paid into the auditor's fee fund. This indicates that the auditor may thus increase the office revenue, but cannot pay this fee to himself.

It is urged that the fifteen cent fee is not sufficient to maintain the motor vehicle license office. The legislature did not intend that it should be sufficient for that purpose. If the law were properly interpreted and administered, the inadequacy of the fifteen cent fee would not be encountered; the salary and actual and necessary expenses of the administration would be properly provided for out of the proper public funds derived by the motor vehicle license fees.

However, regardless of whether the fifteen cent fee is adequate, there is no authority at law to increase it to twenty-five cents. Inadequacy of income under the law is no ground to get more income in violation of the law. If administrative action under the law cannot properly administer the law, the remedy required should be sought at the hands of the legislature, not by extra-legal practices.

The court does not determine policy, but in declaring the present policy illegal, makes the observation that instead of increasing the fifteen cent fee, it should be abolished, and the actual expenses necessary in administering the law paid from the vast sums collected as licenses, largely diverted to other purposes aside from public highway or motor vehicle uses.

It is urged that the same system obtains over the entire state. Extension of an illegal practice does not legalize it, but rather emphasizes its injurious effects.

It is contended that the service rendered is not required by law. No public office should withhold the service essentially necessary to effect the purposes of the law and the office, and the service here rendered is in fact no more than the law contemplated and proper public policy requires.

It is contended that this owner could have refused to make the payment of the charge. No owner should be compelled to protect himself against, or accede to, improper charges, for the inherent duty of public office is to protect the public and every individual, under the law enforced.

It is contended that the large placard notices were legally sufficient to advise the applicant so that he could have avoided the extra charge by bringing his papers fully filled out. A public office is not a bargain counter, and citizens should not be required to select the prices they pay, nor be on guard against illegal charges; they have a right to reliance on the belief that the only fee charged is a legal fee.

The court does not find the defendant did anything not authorized and approved by his superior officer, and regards it as unfortunate that he should be thus placed in an embarrassing position and penalized by the illegal system permitted by the state bureau.

The court finds the charge of ten cents, or any fee additional to the fifteen cent statutory fee, illegal, regardless of whether paid voluntarily or involuntarily. It finds that the state registrar of motor vehicles has no authority to instruct the deputy registrar to make such charge, but has a specific duty to prevent and prohibit its collection. It finds that the collection has been under color of public office and is not only illegal but submissive of public trust and inimical to public rights. It finds that the deputy registrars' salaries, in whole or in part, should not be paid by special fees, either inside the fifteen cent statutory provision, or by extra legal collections. It finds that the present system in the respects herein presented is without foundation of law and contrary to public policy. It finds that the plaintiff, and every other person similarly situated, is entitled to a refund of the fee illegally exacted.

Considering now the matter of remedy, the court observes that the petition of the plaintiff seeks recovery of damages in the sum of ten cents, an accounting for all fees illegally collected, and the general equitable intervention of the court. The intervention of equity being invoked, the broad powers of the court may be used to accomplish effectively the proper purposes necessary under the showing made on the petition, even though there be a claim for civil damages, upon the principle that once equity jurisdiction attaches, it is complete and commanding.

The court is confronted with the fact that the plaintiff is one of a large class of more than 36,000 people who paid an extra fee, either of ten cents or some other sum to this defendant. Since the class set forth in the petition consists of motor vehicle

licenses, and the defendant admits that he made the same or similar charges to practically all of the applicants, and he is now charged with the responsibility of issuing licenses to motor vehicle drivers in this county, it is obvious that both the subject matter involved, the nature of the action, the nature of the rights questioned, and the nature of the duties involved make the action properly one for adjudication as of class right.

If each of the automobile licensees were compelled to file a separate suit, interminable and wasteful litigation would be involved, and furthermore the amount of the sum sought to be recovered being so small, a travesty upon court processes would result. It is to avoid multiplicity of suits, particularly in cases of this nature, that equity acts. Furthermore, the matter rises beyond the individual rights of a licensee and reaches to the conduct of a public office, so that the broader the remedy applied by the court the more effectively the court approaches to a conclusive adjudication of the question presented. Furthermore, the defendant is now in office and charged with a continuation of the duties heretofore discharged, with the same policy objected to in this case now in force, and with every probability that it will continue in force unless stopped by order of this court. For that reason, the court is of the opinion that the prayer of this petition seeking the equitable intervention of the court invokes the broad equity powers of the court, which being thus properly invoked may reach to all objects properly to be attained.

The exercise of the jurisdiction thus held involves the several propositions presented in this manner:

(1) Whether the plaintiff shall recover the sum sought from the defendant;

(2) Whether the class represented by the plaintiff in this case shall recover by a general mandatory order to the defendant to repay the sums improperly collected;

(3) Whether an injunction against further collections of similar sums or any sums over and above the statutory allowance shall be allowed; and

(4) Whether or not a mandatory order compelling issuance of licenses without this extra charge in reference to the general duties of the deputy registrar shall be made.

The court having found that the ten cent charge made to this plaintiff was illegal, it follows as of course that the plaintiff should recover this amount from the defendant.

Considering the claims of the class established in this suit, each with a very small claim, the court finds each and every similar claim to be valid and subsisting at law and legally collectible from the defendant. Being a court of equity, and having before it jurisdiction of the person and the subject matter, and having authority to issue an order which will comprehensively adjudicate all these potential claims, the court is of the opinion that a mandatory injunction directed to the defendant, ordering that he shall repay to each individual applicant who makes personal request at his office for repayment, and presents showing as to the amount illegally collected, should be issued.

In this connection, the court takes cognizance of the broad aspects of the questions relating to the right of recovery of amounts voluntarily or involuntarily paid over and beyond the authority of the officer or deputy to collect. No public officer having a right to receive compensation for public service extra and beyond that fixed by law, and the deputy in this case being a subordinate officer of the state registrar, not specifically provided with salary, the court is confronted with the inquiry whether the payment made to him was a voluntary employment of him as an individual by the applicant, or was extra compensation paid voluntarily or involuntarily by the applicant to him in his official capacity.

Broad public policy requires the court to ignore such academic distinctions, particularly when the court regards the fee payment as exacted by practical compulsion, by the very nature of the circumstances and conditions surrounding the applicant, and the imperative necessity of utilizing his motor vehicle, which utilization could not be made without license.

The defendant had established a public office and every act and performance in that office was under the guise of public authority. His entire action in regard to license is official.

Having held that the defendant could not make the charge, it follows that the court must find that he cannot retain the funds thus collected. Authorization, condonation, or even direct instruction from his superior, the registrar of motor vehicles of the state, would not affect the principle thus determined. On the other hand, each individual applicant has a claim at law for

civil recovery, but as indicated hereinbefore, the court having now jurisdiction over the entire matter, and acting as a court of equity, has the power to effect in this decision all the results attainable by thousands of suits in courts of law. It is obvious that such suits will not be filed, and the court feels the additional obligation thus presented to grant equitable relief.

Under the premises presented, broad and liberal interpretation of the equitable powers of the court should be recognized, and accordingly a mandatory injunction is required by the very nature and circumstances presented in the case.

While used with caution, a mandatory injunction is the proper remedy to effect restoration of rights illegally invaded or destroyed, and accomplishes effectively the final effect of a restorative interdict of the court. The court scarcely expects that any appreciable portion of those paying the fee herein ordered refunded will seek refund. The preservation of the principle herein announced justifies the order made.

Coming now to the consideration of the matter of a general injunction against further charges of this nature, the court is confronted with two prime and determinative facts: First, the system now in force and effect in this respect is illegal; and, second, it is being continued and under all probability will be continued by the defendant. Under the circumstances, if illegal administration is not recognized and remedied by court decision, further illegal collections will be made with further invasion of public right in that respect, with continuation of a system which is contrary to law and public policy.

Under such circumstances it is the duty of the court to so adjudicate this case as to not only correct the instant wrong, but to also protect the public and stop further illegal administration of the law. This is particularly the duty of the court since the petitioner herein, representing a class of many thousands, is invoking protection to that class which is equivalent to the entire motor vehicle using population of the county. The very nature of the case requires a court decision of conclusive and effective nature. Illegality of the present system being determined, its continuation in the jurisdiction of the court should be prohibited.

An injunction against the defendant should issue preventing any further collection of any sum or fee extra and above

that specifically provided by the statute, and prohibiting him or any of his employees from soliciting, compelling or accepting any fee in addition to the fifteen cent extra fee provided by the statute, for any service rendered under color of his office.

It appears, further, that there is a clear statutory duty resting upon the defendant to issue licenses when the applicant complies with the law in regard to a presentation of his application and proper documentary showings and pays the fee as provided by statute, including, if the charge is made, the sum of fifteen cents as provided by the statute herein considered. Such duty being clearly provided by law, the court is of the opinion that a mandamus would issue if sought upon refusal of the defendant to issue a license in conformity with the decision herein made.

The equitable injunction herein announced should and will, if effectively observed, accomplish all the purposes that might be accomplished in a particular case at mandamus, and the court presumes the defendant will issue licenses hereafter without the charge determined here to be illegal. Upon showing otherwise in a case properly before it, the court would be compelled to issue forthwith a mandamus.

The court finds, therefore, that orders of the court should issue providing:

(1) A mandatory injunction that the defendant pay the plaintiff herein the illegally collected fees.

(2) A mandatory injunction that the defendant repay each and every motor vehicle licensee similarly placed, the illegally collected fee, upon request by such applicant, and proper showing therefor, at the office of the defendant.

(3) A prohibitory injunction enjoining the defendant from making and collecting the extra fee herein declared illegal from any of the class herein set up, from the date of this order.